FILED
2018 Apr-26 AM 11:27
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
JASPER DIVISION

| | |
|---|---|
| BOWIE'S PRIORITY CARE PHARMACY, L.L.C. d/b/a BOWIE'S DISCOUNT PHARMACY, <br><br> Plaintiff, <br><br> vs. <br><br> CAREMARKPCS, L.L.C., <br><br> Defendant. | 6:18-cv-00300-LSC |

## Memorandum of Opinion

Before this Court is Defendant CaremarkPCS, LLC ("Defendant")'s Motion to Dismiss and Compel Arbitration. (Doc. 17.) In its Motion, Defendant argues that this case is subject to dismissal in favor of arbitration pursuant to a valid and enforceable written arbitration provision. Plaintiff Bowie's Priority Care Pharmacy ("Plaintiff") has responded to the Motion, and argues that the arbitration clause upon which Defendant relies is not enforceable because Plaintiff did not agree to be bound by it. For the following reasons, Defendant's Motion to Dismiss is due to be GRANTED.

### I. Facts

Plaintiff is a local, independently owned pharmacy in Jasper, Alabama. The previous owner of the pharmacy's assets was Richard Bowie, who operated the pharmacy as a sole proprietorship under the name "Bowie's Discount Pharmacy." In 1996, Bowie's Discount Pharmacy entered into a contract with PCS Health Systems, Inc. ("PCS") for pharmaceutical benefits management services to be provided by PCS on behalf of Bowie's Discount Pharmacy. Defendant is PCS's successor-in-interest and has the right to enforce the contracts it entered into.

Bowie's Discount Pharmacy and PCS's relationship was governed by a Provider Agreement. The Provider Agreement also incorporated a separate document titled the "Provider Manual," which laid out in detail the rights and obligations of the two parties. In practical terms, Bowie's Discount Pharmacy would fill prescriptions presented by patients or their doctors, and then would submit claims to PCS/ Defendant for reimbursement. Importantly, both the Provider Agreement and the Provider Manual contain arbitration provisions, which mandate that all disputes arising from the parties' relationship under the agreement must be administered exclusively by the American Arbitration Association.

The parties' direct relationship began when Plaintiff purchased Bowie's Discount Pharmacy from Richard Bowie in 2016 via an Asset Purchase Agreement. Plaintiff continued to run the pharmacy as "Bowie's Discount Pharmacy" to

utilize longstanding customer goodwill. Plaintiff likewise continued its predecessor's relationship with Defendant by filling prescriptions and complying with all other obligations under the Provider Manual. (Doc. 1 ¶ 4 ("[Plaintiff] and [Defendant] are in a contractual relationship under which [Plaintiff] is a participating pharmacy in [Defendant]'s pharmacy network.")

The parties' dispute arose in September 2017 when an independent contractor hired by Defendant conducted an audit of Plaintiff's pharmacy operations. The purpose of the audit was to review the underlying basis for claims that Plaintiff had submitted to Defendant, and received payment for, in the time period running from August 1, 2016, until July 31, 2017. Plaintiff prepared for the September 27, 2017 audit by gathering information on specific patients and prescriptions as requested by Defendant. The contractor, however, did not appear on September 27; she informed Plaintiff that she would be arriving the following day. On September 28, 2017, the contractor indeed performed the audit, but with a modified list of patients and prescriptions that differed from the earlier list submitted by Defendant.

After the audit, Defendant sent a list of "discrepant" claims to Plaintiff. Apparently, a claim for payment is discrepant when it was submitted by Plaintiff to Defendant without adequate documentation. Plaintiff submitted additional

documentation to Defendant, which brought the cash value of those discrepant claims to a tenth of the original amount. On December 13, 2017, Defendant sent to Plaintiff a letter stating that it had completed Plaintiff's audit, and that "[Defendant] will begin withholding funds from future claims payments, as authorized by the Provider Agreement and in accordance with applicable state Law." (Doc. 1 ¶ 39.)

Three weeks later, Plaintiff received another letter from Defendant, which stated that Defendant's claims payments were subject to "temporary payment withholding" ("TPW") under the Provider Agreement. TPW is a drastic step in a pharmaceutical benefits management relationship. Under TPW, the manager, here Defendant, ceases to reimburse the pharmacy, here Plaintiff, for prescriptions already filled but not paid and ceases all future payments until the TPW is removed. Plaintiff alleges that due to TPW, Defendant has withheld over $300,000 in reimbursements under their agreement.

## II. STANDARD OF REVIEW

The standard of review for a motion seeking to compel arbitration is analogous to a summary judgment motion. *See In re Checking Account Overdraft Litig.*, 754 F.3d 1290, 1294 (11th Cir. 2014) (describing an order compelling arbitration as "summary-judgment-like" because it is "in effect a summary

disposition of the issue of whether or not there has been a meeting of the minds on the agreement to arbitrate") (citations omitted); *see also Fleetwood Enters, Inc. v. Bruno*, 784 So. 2d 277, 280 (Ala. 2000). Where the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," a court shall grant a motion for summary judgment. Fed. R. Civ. P. 56(a). A fact is material "if, under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259 (11th Cir. 2004). A genuine dispute as to a material fact exists where "the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor." *Waddell v. Valley Forge Dental Assocs., Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001).

### III. DISCUSSION

#### a. THE EXISTENCE OF A BINDING CONTRACT

If there is an arbitration agreement governing the parties' dispute, it is governed by the Federal Arbitration Act (the "FAA"), 9 U.S.C. §§ 1 *et seq.*, which "embodies a liberal federal policy favoring arbitration agreements." *Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1367 (11th Cir. 2005) (quotation marks omitted). Indeed, the Eleventh Circuit has recognized that the FAA creates a "presumption of arbitrability" such that "any doubts concerning the scope of

arbitrable issues should be resolved in favor of arbitration." *Dasher v. RBC Bank (USA)*, 745 F.3d 1111, 1115–16 (11th Cir. 2014) (quotation marks omitted); *see Granite Rock Co. v. Int'l Bd. Of Teamsters*, 561 U.S. 287, 298 (2010). Nonetheless, "while doubts concerning the scope of an arbitration clause should be resolved in favor of arbitration, the presumption does not apply to disputes concerning whether an agreement to arbitrate has been made." *Dasher*, 745 F.3d at 1116 (citation omitted); *see Granite Rock*, 561 U.S. at 301 (directing courts to "apply[] the presumption of arbitrability only" to "a validly formed and enforceable arbitration agreement"). "The threshold question of whether an arbitration agreement exists at all is 'simply a matter of contract.'" *Bazemore v. Jefferson Capital Sys., LLC*, 827 F.3d 1325, 1329 (11th Cir. 2016) (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995)). Absent such an agreement, "a court cannot compel the parties to settle their dispute in an arbitral forum." *Klay v. All Defendants*, 389 F.3d 1191, 1200 (11th Cir. 2004).

Plaintiff disputes the existence of a binding agreement to arbitrate between itself and Defendant. Defendant points to the Provider Agreement and the Provider Manual, both of which include arbitration clauses, as valid contracts between the parties. "[I]n determining whether a binding [arbitration] agreement arose between the parties, courts apply the contract law of the particular state that

governs the formation of contracts." *Bazemore*, 827 F.3d at 1329 (alteration in original) (quoting *Caley*, 428 F.3d at 1368). While Defendant argues that a choice-of-law provision in the Provider Manual mandates that Arizona law govern all disputes, that provision is only binding if a contract exists. Because the Court cannot apply the choice-of-law clause until it determines that the parties have a valid contract, it applies Alabama law to determine whether a contract exists between the parties. *St. Paul Fire & Marine Ins. Co. v. ERA Oxford Realty Co. Greystone, LLC*, 572 F.3d 893, 894 n.1 (11th Cir. 2009) ("A federal court sitting in diversity, as in this case, must apply the choice of law principles of the state in which it sits. In determining which state's law applies in a contract dispute, Alabama follows the principle of *lex loci contractus*, applying the law of the state where the contract was formed."(quoting *Cherokee Ins. Co., Inc. v. Sanches*, 975 So. 2d 287, 292 (Ala.2007))). In any case, Defendant admits that there is no conflict between Alabama and Arizona law in determining contract formation. Thus, the Court applies Alabama law.

Under Alabama law, "[t]he elements of a valid contract include: an offer and an acceptance, consideration, and mutual assent to terms essential to the formation of a contract." *Shaffer v. Regions Financial Corp.*, 29 So. 3d 872, 880 (Ala. 2009) (citations and internal quotations omitted). Plaintiff argues that there is no valid

contract between it and Defendant, because it never signed either the Provider Agreement or the Provider Manual, and never agreed to the terms therein. According to Plaintiff's stance, Richard Bowie signed the Provider Agreement and agreed to be bound by its terms. Plaintiff later purchased Bowie's Discount Pharmacy from Richard Bowie according to the Asset Purchase Agreement. Plaintiff states that it was not bound to contracts entered into prior to the sale by Richard Bowie according to the terms of the Asset Purchase Agreement, Paragraph 1.1 of which states that "Plaintiff shall not be deemed by virtue of any of the transactions contemplated by this Agreement to have assumed or otherwise to have become liable for any liabilities or obligations . . . of [Richard Bowie]." (Doc. 31 at 2.)

Regardless, Plaintiff's argument fails because it has shown through its conduct and past behavior to have accepted the Provider Manual's terms, as such, the Court need not even look to whether the Provider Agreement *also* binds the Plaintiff. A cursory review of Plaintiff's Complaint reveals repeated and forceful allegations concerning the applicability of the Provider Manual. A sampling of these allegations includes:

> [Plaintiff]'s and [Defendant]'s relationship is governed *by a Provider Manual*, which is attached hereto as Exhibit "A". *The Provider Manual provides extensive guidelines for the parties' relationship* and covers topics such as "Credentialing and Quality Management," "Pharmacy

Services and Standards," "Claims Submission," etc. Perhaps unsurprisingly, most of the terms included in the Provider Manual, which was drafted by [Defendant], are drafted heavily in [Defendant]'s favor.

. . .

In addition to its stated reasons for withholding payments being factually inaccurate, [Defendant]'s withholding of reimbursements to [Plaintiff] *is in violation of the Provider Manual*. [Defendant] did not provide [Plaintiff] an opportunity to appeal the decision prior to completely cutting off all claims payments. *This conduct is not in accordance with the terms of the Provider Manual.*

. . .

Throughout [Plaintiff]'s relationship with Defendant, the parties' conduct has been governed by the Provider Manual.

. . .

[Plaintiff] has at all times complied with the Provider Manual. In stark contrast, [Defendant] has flagrantly ignored the Provider Manual's language and attempted to use its superior bargaining power and authority to force [Plaintiff] out of business.

. . .

The Provider Manual provides stringent requirements with which [Defendant] must comply when auditing [Plaintiff]. [Defendant]'s conduct in the present circumstance failed to comply with those requirements.

(Doc. 1 ¶¶ 30, 46 55, 56, 57 (emphasis added).) An additional attachment to Plaintiff's Complaint appears to be a demand letter written by Plaintiff's counsel to Defendant's representative which again claims that Defendant has violated its

duties to Plaintiff under the Provider Manual: "[Defendant]'s immediate withholding of payments lawfully due to Bowie's prior to completion of its audit and the applicable appeals process violates both the CVS/Caremark Provider Manual and Alabama law." (Doc. 1 Ex. F.) "When [the Court] rules on motions to compel arbitration, [the Court] look[s] to 'the facts alleged in the . . . complaint.'" *Doe v. Princess Cruise Lines, Ltd.*, 657 F.3d 1204, 1208 (11th Cir. 2011). Obviously, the allegations above that the parties' relationship is governed by the Provider Manual are a legal conclusion. But the allegations of material fact intertwined with this legal conclusion strongly indicate that at the time of filing suit, Plaintiff believed its relationship was governed by the Provider Manual and acted accordingly.

Plaintiff appears to be taking the position, if only temporarily in opposition to Defendant's present Motion, that there is no contract between it and Defendant. The Court cannot emphasize enough that Plaintiff has directly alleged "[Plaintiff] and [Defendant]'s relationship is governed by a Provider Manual, which is attached hereto as Exhibit 'A' [to Plaintiff's Complaint]." (Doc. 1 at ¶ 30.) In its still-pending Motion for Preliminary Injunction, Plaintiff likewise states: "[Defendant]'s conduct is in breach of the Provider Manual, a three hundred page document that governs the parties' relationship," (doc. 2 at 3), and repeated

allegations that Defendant has failed to perform its contractual duties. (Doc. 3 at 10-11.) Plaintiff's current argument against the existence of contractual relations with Defendant under the Provider Manual is as inherently contradictory as swimming without getting wet. The Provider's Manual either governed the parties' relationship or it didn't. Plaintiff cannot take opposite, disingenuous positions in its pleadings based on what is most convenient to it.[1]

Other than the Plaintiff's repeated allegations and evidentiary submissions that the Provider Manual governs its relationship with Defendant—and the Court does not need more—Plaintiff's conduct evinces an intent to adopt to the terms of the Provider's Manual. In *Ex parte Rush*, the Supreme Court of Alabama faced a similar issue to this action, whether "the absence of [the plaintiffs'] signatures on the contract conclusively establishes a lack of mutual assent on their part to the arbitration provision." 730 So. 2d 1175, 1177 (Ala. 1999). *Ex parte Rush* involved homeowners who had brought suit against the defendant, who had contracted with plaintiffs to provide them a "termite protection plan." The defendant had sent plaintiffs a contract promising to protect their house against termites. The plaintiffs

---

[1] Indeed, without making any holding to this effect, the Court speculates that if it found that the Provider Manual did not govern the parties' agreement, then many, if not all, of Plaintiff's asserted claims for relief would necessarily fail. Plaintiff brings claims of Breach of Contract, Breach of Fiduciary Duty, Fraud, Willful Deceit with Intent to Induce Injury or Risk, and Tortious Interference with Business or Contractual Relations—all of which appear to be based on its contractual relationship with Defendant under the Provider Manual.

paid the required fee for several years before discovering a termite infestation. The defendant then paid for over $17,000 in repairs under the protection plan. The plaintiffs later sued defendants alleging other state-law claims arising from the same termite infestation, and the defendant moved to compel arbitration according to a provision in the "termite protection plan." Like in this action, the plaintiffs in *Ex parte Rush* took the position that they were not bound by the arbitration provision of the plan because they had not signed it.

In rejecting the plaintiffs' lack-of-signature argument, *Ex parte Rush* articulated the same legal standard applicable to this case, which deserves to be quoted in full:

> Whether a contract exists must be determined under general state-law contract principles. The purpose of a signature on a contract is to show mutual assent, however, the existence of a contract may also be inferred from other external and objective manifestations of mutual assent. Unless a contract is required by a statute to be signed (the FAA contains no such requirement), or by the Statute of Frauds to be in writing (the contract here is not subject to Alabama's Statute of Frauds, Ala. Code 1975, § 8–9–2, which requires the signature of the party against whom enforcement is sought), or unless the parties agree that a contract is not binding until it is signed by both of them (there is no evidence of such an agreement), it need not be signed by the party against whom enforcement is sought, provided it is accepted and acted upon.

*Id.* at 1177-78 (quotation marks and citations omitted). Because the plaintiffs in *Ex parte Rush* acted as if they had assented to the "termite protection plan," by

receiving the contract in the mail, paying an annual fee, making claims under the plan, and actively supervising the defendant's repairs to their home, the plaintiffs had assented to the other terms of the plan. *Id.* at 1178.

There is no dispute that Plaintiff received copies of the Provider Manual, that Plaintiff submitted claims for payment under the Provider Manual, allowed Defendant to conduct audits of Plaintiff's premises according to the Provider Manual, wrote a demand letter premised on the Provider Manual, requested relief in "accordance with the terms of the Provider Manual," (doc. 1 ¶ 16), and brought this suit at least in part for violation of the Provider Manual (*id.* at 54-87 (Count I "Breach of Contract")). Plaintiff has not shown or pointed to other authority mandating that they must sign the Provider Manual in order for it to be enforceable. *Ex parte Rush*'s similar construction of plaintiff's objection to the existence of a contract despite their behavior showing mutual assent is spot on. *See also S. Energy Homes, Inc. v. Hennis*, 776 So. 2d 105, 109 (Ala. 2000) ("[Appellee] may not pursue his breach-of-express-warranty claim against [Appellant]. This is so because he cannot rely on the express written warranty and, at the same time, disavow the arbitration provision contained therein." (citing *Ex parte Warren*, 718 So. 2d 45 (Ala. 1998))).

Plaintiff makes the argument that "the submission of claims for adjudication does not constitute acceptance of all specific terms of the Provider Manual." (Doc. 27 at 28 n.9.) Plaintiff correctly points out the Alabama Supreme Court case *Birmingham Television Corporation v. Water Works* for the proposition that a party's tendering of goods for bailment alone cannot be construed as acceptance of specific contract terms where the party is not aware of the existence of those contract terms. 290 So. 2d 636, 642 (Ala. 1974). While much of *Birmingham Television Corporation* dealt specifically with the law of bailments, it nonetheless reiterated the general rule stated above that: "[w]hile the acts of a party may under some circumstances be such as to constitute an acceptance of a contract, surely such could not be the case unless the acting party is shown to have had knowledge of the contract." *Id. Birmingham Television Corporation* is nothing like this case because Plaintiff's conduct in total evinces its knowledge of the existence of the Provider Manual, specific reference to the terms therein, and reliance on the applicability of the terms of the Provider Manual.

### b. AGREEMENT TO SUBMIT TO ARBITRATOR THE QUESTION OF ARBITRABILITY OF CLAIMS

As the Court has determined there is a valid arbitration agreement, the Court must discern whether the parties' dispute falls within the scope of their agreement to arbitrate. *Lambert v. Austin Ind.*, 544 F.3d 1192, 1195 (11th Cir. 2008).

"[T]he question of arbitrability . . . is undeniably an issue for judicial determination. Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986). If the parties have unmistakably agreed to arbitrate "arbitrability," threshold questions such as whether certain claims are subject to arbitration, are for the arbitrator and not the Court.

The Arbitration Provision in the Provider Manual—attached to the Plaintiff's Complaint—provides that:

> Any and all disputes between Provider and Caremark . . . . including but not limited to disputes in connection with, arising out of, or relating in any way to, the Provider Agreement or to *Provider's participation in one or more Caremark networks or exclusion from any Caremark networks, will be exclusively settled by arbitration . . . . the arbitration shall be administered by the American Arbitration Association ("AAA") pursuant to the then applicable AAA Commercial Arbitration Rules and Mediation Procedures (available from the AAA). . . . The arbitrator(s) shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability or formation of the agreement to arbitrate, including, but not limited to any claim that all or part of the agreement to arbitrate is void or voidable for any reason . . . .*
>
> **Arbitration with respect to a dispute is binding and neither Provider nor Caremark will have the right to litigate that dispute through a court. In arbitration, Provider and Caremark will not have the rights that are provided in court, including the right to a trial by judge or jury. In addition, the right to discovery and the right to appeal are limited or eliminated by arbitration. All of these**

> **rights are waived and disputes must be resolved through arbitration.**
>
> The above notwithstanding, nothing in this provision shall prevent either party from utilizing the AAA's procedures for emergency relief to seek preliminary injunctive relief to halt or prevent a breach of this Provider Agreement.
>
> . . .
>
> The terms of this **Arbitration** section apply notwithstanding any other or contrary provision in the Provider Agreement, including, but not limited to, any contrary language in any **Third Party Beneficiary** provision. This **Arbitration** section survives the termination of the Provider Agreement and the completion of the business relationship between Provider and Caremark. This arbitration agreement is made pursuant to a transaction involving interstate commerce, and shall be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1-16.

(Doc. 1 Ex. A at 72-73. (emphasis added)). The text of the arbitration clause provides that the arbitration will be conducted "by the American Arbitration Association ("AAA") pursuant to the then applicable AAA Commercial Arbitration Rules and Mediation Procedures." *Id.* at 72. Rule 7(a) of the AAA Commercial Arbitration Rules and Mediation Procedures provides: "The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim." Am. Arbitration Ass'n, Commercial Arbitration Rules and Mediation Procedures, https://www.adr.org/sites/default/files/Commercial%20Rules.pdf. "By incorporating the

AAA Rules, including Rule 8 [substantively identical to Rule 7(a) quoted *supra*], into their agreement, the parties clearly and unmistakably agreed that the arbitrator should decide whether the arbitration clause is valid." *Terminix Int'l Co., LP v. Palmer Ranch Ltd. P'ship*, 432 F.3d 1327, 1332 (11th Cir. 2005); *see also id.* ("[W]hen . . . parties explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator." (quoting *Contec Corp. v. Remote Solution, Co.*, 398 F.3d 205, 208 (2d Cir. 2005))). The Court notes that the Arbitration Clause itself provides that: "The arbitrator(s) shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability or formation of the agreement to arbitrate, including but not limited to, any claim that all or part of the agreement to arbitrate is void or voidable for any reason." (Doc. 1 Ex. A at 72.) Not only is the AAA rules allowing the arbitrator to determine arbitrability incorporated into the parties' Provider Manual, but the text of the Provider Manual itself indicates that the arbitrator is to have exclusive authority to do so. Any question about the scope of arbitration or the arbitrability of any claim is to be decided by the arbitrator according to the parties' agreement.

Plaintiff raises no real argument against the arbitrability provision quoted above. Instead, it simply reiterates that it did not agree to arbitrate its claims because it did not sign the Provider Manual. This argument fails for the reasons stated above—Plaintiff has clearly assented to the Provider Manual by receiving copies of the Provider Manual, submitting claims for payment under the Provider Manual, allowed Defendant to conduct audits of Plaintiff's premises according to the Provider Manual, writing a demand letter premised on the contractual rights created by the Provider Manual, requesting relief in "accordance with the terms of the Provider Manual," and bringing this suit, at least in part, for violation of the Provider Manual.

## IV. Conclusion

For the reasons stated above, Defendant's Motion to Dismiss and Compel Arbitration is due to be GRANTED and this action DISMISSED without PREJUDICE so that the parties may arbitrate this dispute. Plaintiff's Motion for Preliminary Injunction, (docs. 2 & 3), as well as its Motion for Hearing on Preliminary Injunction (doc. 13) are due to be DENIED. A separate Order consistent with this Memorandum of Opinion will be entered herewith.

This 26th Day of April 26, 2018.

_____
L. Scott Coogler
United States District Judge

190485